## Case No. 6,532.

### HITCHCOCK et al. v. GALVESTON.

[2 Woods, 272; [1] 2 Cent. Law J. 331.]

Circuit Court, E. D. Texas.   Dec. Term, 1874.[2]

ENTIRE CONTRACT—BREACH—NEGOTIABLE COUPON BONDS—POWER OF CITY TO ISSUE.

1. Parties entered into a contract with the city council of Galveston, whereby they agreed to fill, grade, tamp, roll, and curb certain specified sidewalks, and to lay down and fabricate thereon an asphalt pavement, and to obtain the written consent of the owners of lots abutting on said pavements, to the laying of said asphalt pavement. Without obtaining such consent, the contractors proceeded to fill, grade, etc., the sidewalks, but before completing the work preparatory to the laying of the pavement, they were forbidden by the city authorities from going on with the work, and the contract was repudiated by the city. In a suit brought by the contractors to recover for the work actually done, and also damages for the breach of the contract by the city, *held*, that the contract was entire; that the obtaining of the consent of the property holders to the pavement named was a condition precedent, to be performed before any work was done, and there could be no recovery in the action unless it was averred and shown that such consent had been obtained.

[See note at end of case.]

2. A municipal corporation has not inherent power to issue negotiable coupon bonds which shall circulate as commercial paper, and be unimpeachable in the hands of a bona fide holder.

[Cited in Hopper v. Town of Covington, 8 Fed. 779.]

3. A city was authorized by its charter to exact the cost of sidewalk improvements from the owners of abutting lots to be collected by assessments on the property; to raise money for general and special purposes by taxation; and to issue bonds for a single purpose which was not sidewalk improvements: *Held*, that these provisions of the charter excluded the power to issue negotiable coupon bonds to pay for sidewalk improvements.

This cause was tried on the defendant's demurrer to plaintiffs' petition. Under the system of pleading which prevails in Texas, much of the evidence on which plaintiffs relied to sustain their cause was set out in the petition. The case as made by plaintiffs' petition was substantially as follows: On February 28, 1874, the plaintiffs, as partners, entered into a contract in writing with the city of Galveston, by which they agreed, for a compensation therein named, to fill, grade, tamp, roll, curb and pave certain sidewalks in the city of Galveston. This contract was made in behalf of the city by the mayor and the chairman of the committee of the common council on streets and alleys, by virtue and in pursuance of certain ordinances of the city council. The plaintiffs, the petition averred, immediately after the execution of the contract, entered upon the performance of the work, and continued it, at great labor and expense, for forty days, when they were compelled by force and the power and authority of the defendant, to desist from and

abandon the work, and, although always ready and anxious to perform the said contract and complete said work, have ever since been wrongfully and willfully forbidden and prevented by the defendant from so doing. The work done by the plaintiffs at the contract price was worth $18,194, and the profits on the unfinished portion of the work, not including the paving, would have been $127,- 990.57. For the aggregate of these two sums, to wit, $146,184.57, and for $50,000 general damage, the plaintiffs asked judgment. The petition set out as exhibits, and as a part of itself, the contract in full and the several ordinances of the city council, by authority of which it was claimed the contract was made. It was also averred, in an amended petition, that after its execution by the mayor and chairman of the streets and alleys committee, the contract was approved and ratified by the action of the city council.

It appeared from the exhibits to the petition that, by the contract upon which the suit was brought, the city of Galveston bound itself to pay to the plaintiffs, under the name of D. G. Hitchcock & Co., in the bonds of the city of Galveston, styled "Galveston City Bonds for Sidewalk Improvements," to be taken at par, a named rate for every square yard of pavement laid down by the plaintiffs upon certain sidewalks designated in the contract; said pavement to be composed of asphalt in bulk, rolled solid to the thickness of three inches: "provided, however, that the said D. G. Hitchcock & Co. obtain the written consent of the owners of the property fronting or abutting on said sidewalks to the laying down of the said pavement, which written consent or selection of the said pavement shall be filed in the mayor's office with the city clerk." The contract further bound the city to pay to the plaintiffs in the same bonds to be taken at par, a specified price for the filling necessary to be done, preparatory to the laying of the pavement, under which term of "filling" were included grading, tamping and rolling; also, a specified price for the wooden curbing that might be needed or used in filling up and grading the said sidewalks preparatory to the putting down of the pavement. The contract, after thus specifying the work to be done and the prices to be paid therefor, proceeded as follows: "In consideration of all the foregoing, the said D. G. Hitchcock & Co. bind themselves to lay down and fabricate the said pavement in the manner and style above set forth and stipulated; and they also bind themselves to fill, grade, tamp, roll and curb the said sidewalks as above set forth and stipulated, and to receive in payment for all said work the respective prices above stated, and in the bonds of the city of Galveston, styled 'Galveston City Bonds for Sidewalk Improvements,' at par." The charter of the city of Galveston is a public act of the legislature of Texas. In section 8 of article 3 of title 4, it is provided that the city council shall have power "to establish,

---

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[2] [Reversed in 96 U. S. 341.]

erect, construct, regulate and keep in repair bridges, culverts and sewers, sidewalks and crossings. * * * The cost of construction of sidewalks shall be defrayed by the owners of the lot or part of lot or block fronting on the sidewalk, and the cost of any sidewalk constructed by the city shall be collected, if necessary, by the sale of the lot or part of lot or block on which it fronts, together with the cost of collection, in such manner as the city council may, by ordinance, provide, * * * and the balance of the proceeds of sale, after paying the amount due the city and costs of sale, shall be paid by the city to the owner." Section 2 of the same article and title declares that the city council shall not borrow, for general purposes, more than $50,000. Section 3: That the city council shall have power "to appropriate money and provide for the payment of the debts and expenses of the city." Section 4: That the city council shall have power "to provide by ordinance special funds for special purposes, and to make the same disbursable only for the purpose for which the fund was created." The ordinances set out in the petition as authority, by virtue of which the contract sued on was made, were two ordinances, approved August 19, 1873; an ordinance approved October 21, 1873, and an ordinance approved February 3, 1874. The first ordinance, approved August 19, 1873, authorized and directed the mayor and chairman of the committee on streets and alleys "to make a contract or contracts with proper and responsible parties, to fill up, grade and pave the sidewalks on both sides of the hereinafter named streets, and to curb the same; and for this purpose they were directed to advertise for the period of thirty days for bids or proposals to fill up, grade, pave and curb, in part or in whole, the sidewalks herein named." The ordinance then proceeded to specify the sidewalks to be thus improved. Section 2 of this ordinance, as amended by section 1 of the ordinance of October 21, 1873, provided that "said sidewalks shall be paved with either of the following materials: Asphalt, hard bricks, laid in a bed of Portland cement and properly grouted; concrete, made of Portland cement, mixed with other proper materials; or with tiles or stone, laid in a bed of Portland cement; and the curbing around the same shall be made of the best hard bricks, and capped with a plank of heart pine, three inches in thickness and twelve inches wide, properly fastened to the curbing with the necessary iron bolts." Section 5 of the same ordinance provided that "the cost of filling, raising, curbing and paving each separate sidewalk, as soon as the same shall be finished and completed, shall be a charge against the property abutting and fronting thereon, and shall be assessed against the same in the following manner." The section then declared how the cost of the work should be assessed against the property, and that it should be a lien thereon until paid.

Section 6 provided that the assessment should be paid in five annual installments, with interest. On the same day on which this ordinance was approved, another was approved, which authorized the mayor to have printed or engraved coupon bonds of the city of Galveston to the amount of $250,000, to be styled "Galveston City Bonds for Sidewalk Improvements;" to draw interest at ten per cent., and to be payable to the bearer in fifteen years, provided that the city council should have the right to redeem at par any or all of said bonds at any time after five years from their sale or disposition. This ordinance also provided that the assessments made on property for the construction of sidewalks should, as they were collected, be appropriated to the payment of the interest on said bonds, and form a sinking fund to pay the principal at their maturity, or when redeemed. The ordinance of the 3d of February, 1874, provided that sidewalks on both sides of certain other streets therein named should be filled up, graded, curbed and paved; and it then proceeded to direct that "the sidewalks shall be filled up to the grade established by the civil engineer, and curbed with cypress wood, stone or brick, and a pavement six feet in width, laid in the center of the same—the said pavement to be composed of either asphalt, hard brick laid in Portland cement, or other proper materials, tiles or stone." This ordinance authorized the mayor and chairman of the streets and alleys committee "to make a contract or contracts with proper and responsible parties to fill up, grade, curb and pave the said sidewalks," and directed that the cost of the work should be assessed against the owners of the lots, in the same way as prescribed in the ordinance of August 19, 1873. All these facts appeared either from the petition of plaintiffs or from the charter of the city of Galveston, of which, being a public act, the court took judicial notice.

F. Charles Hume, for plaintiffs.
Wm. P. Ballinger and Geo. Flournoy, for defendant.

WOODS, Circuit Judge. The defendant alleges numerous grounds of demurrer, many of which I do not think well taken. As in my opinion, some of the grounds of demurrer are well taken, it is not necessary to notice particularly those which are overruled.

The first ground of demurrer is the general one, that the facts stated in the petition are not sufficient in law for the plaintiffs to have and maintain their action against the defendant.

I pass over the question whether the city council could delegate the authority to the mayor and chairman of the streets and alleys committee to make the contract in question. Let it be conceded that the power of these two officers was as full as the power of the city council itself to make the contract. The question meets us at the threshold of the

plaintiffs' case, Have they made the necessary averments to entitle them to a recovery, conceding that the contract was a valid one and binding on the city of Galveston?

The ordinances by virtue of which the mayor and chairman of the committee acted are to be considered in giving construction to the contract. These officers act as the agents of the city, and the contract recites that it is made in accordance with the authority vested in them by the city council. It is to be presumed that the agents of the city made the contract in pursuance of the powers conferred upon them, and the plaintiffs, being bound to know the extent of the authority of the agents with whom they were contracting, made such a contract with them as they were authorized to make. Story, Ag. § 73. Both the ordinances which empower the mayor and chairman of the committee to contract require them to enter into contracts with responsible parties to "fill up, grade, curb and pave the sidewalks designated." It is clear to my mind that this is authority to contract for filling, grading, curbing and paving, and not for filling and grading without curbing or paving. It was not necessary for the mayor and chairman to contract with the same party to do all the work. But they were required to contract to have all this work done by somebody. The mayor and chairman so construed their authority, and entered into the contract with the plaintiffs, by which the plaintiffs bound themselves to "lay down and fabricate the said pavement in the manner and style above set forth and stipulated;" and also "to fill, grade, tamp, roll and curb the said sidewalks, as above set forth."

The authority given to the city by its charter was to construct "sidewalks," the ordinances contemplated the construction of sidewalks, and the chief end and purpose of the contract was the construction of sidewalks. The filling, grading and curbing were only the preparatory steps necessary to the completion of a sidewalk by the putting down of the pavement. The main purpose and the ultimate object were the pavements. No sane man supposes for a moment that the city council desired to raise a bank of sand in front of the lots of the citizens and leave it so, or that such was the purpose of the ordinance or the contract. If the city council had not decided to complete the sidewalks by paving them, they would not have entered upon the work at all. So the contract was intended to provide for paving as well as filling, grading and curbing, and did provide for it. It is clearly not the purpose of the contract that a part of the work should be done and not the residue. The plaintiffs agree to do the whole. The performance of a part only without the consent of the city council is no performance and does not entitle the plaintiffs to a recovery. If there is a condition precedent to the performance of a part of the contract and the contract is an

entirety, that condition precedent must be performed, or the whole contract fails. Now, what does the contract provide? The plaintiffs agree to fill, grade and curb and to pave with asphalt. There is no covenant to pave with anything else. But the contract says, in effect, you shall not pave with asphalt unless you obtain the written consent of the owners of the property abutting on the sidewalks to the laying down of an asphalt pavement, which written consent or selection shall be filed in the mayor's office with the city clerk.

It seems to me that the obtaining of that consent is a condition precedent to be performed before any part of the contract is binding on the city. The plaintiffs agree to fill, grade, tamp, curb, etc., preparatory to the laying down of an asphalt pavement, and then to lay the asphalt pavement, if the owners of the property will consent. It is not to be supposed that if they were prevented from completing a sidewalk by the refusal of the property holders to consent to an asphalt pavement, the contract authorized them to do the work simply preparatory to the laying of a pavement and then leave it in that unfinished condition. How do we know but that the inducement to pay the price specified for grading, etc., was in the fact that the plaintiffs had agreed to lay the asphalt pavement for the specified price? The city of Galveston has agreed by this contract to pay $1.25 per cubic yard for the filling, grading, tamping and rolling of a sidewalk, preparatory to the laying thereon of an asphalt pavement, and then to pay the price of $1.75 per square yard for the laying of such pavement. It has never agreed to pay the sum named for the work necessary to be done preparatory to the laying of any other than an asphalt pavement. This contract must be taken as a whole. The presumption is that the price of one part of the work depends upon the price agreed upon for another part. The price allowed by the contract for filling and grading and curbing may have afforded the plaintiffs a profit, while the price for paving would have afforded none, or even entailed a loss. That this is not mere conjecture is shown by the fact that the petition claims damages for the profit lost in the grading, etc., ranging from one to two hundred per cent., while it claims no loss of profit on the paving. Can the plaintiffs be allowed to pick out the profitable parts of the contract for performance and abandon the unprofitable? They have agreed to do the whole. They cannot do the whole according to the contract, they cannot be in a position to perform in full unless they have the consent of the property holders in writing to the laying down of the particular pavement mentioned in the contract, and that consent is filed in the office of the mayor. They must perform the whole contract, and they cannot, according to the terms of the contract, perform it without compliance with the conditions pre-

cedent. In other words, no part of the contract is binding on the city unless the other party to the contract has first obtained the consent of the property holders to the laying down of the pavement selected. There is no averment in the petition that such consent has been obtained, and without such consent the petition is fatally defective. Jennings v. Moss, 4 Tex. 452; Frazier v. Todd, Id. 461. The demurrer must, therefore, be sustained, on the ground that the petition does not set out facts sufficient to entitle the plaintiffs to recover.

2. It is objected that the city council had no power, either through an agent or by its own ordinance, to make the contract sued on in this case. The contract contemplates the issue by the city of Galveston of bonds to the amount of $250,000, with ten per cent. interest, due in fifteen years, or redeemable, if the city so elect, after five years, to pay for work to be done under the contract. The contract cannot be performed without the issue of the bonds provided for in the ordinance of August 19, 1873. It is denied that the city of Galveston has power, either express or implied, to issue the bonds for the purposes named in the contract, and I think the demurrer to the petition fairly presents the question. I am unable to find any authority in the city charter, either express or clearly implied, to issue bonds or borrow money for the purpose of constructing sidewalks. To pay out bonds is in effect a selling of them, or a borrowing of money on them. Rogers v. Burlington, 3 Wall. [70 U. S.] 666; Com. v. Commissioners of Allegheny Co., 37 Pa. St. 237; Seybert v. Pittsburg, 1 Wall. [68 U. S.] 272.

The clauses from the city charter already cited, and which are referred to by plaintiffs' counsel as containing the authority, do not confer any express authority to borrow money for other than general purposes, nor is the authority clearly implied. The power expressly given to appropriate money and to provide for the payment of debts and expenses of the city, to provide special funds for special purposes, to construct sidewalks, and to assess the cost of their construction upon the owners of the abutting lots, are powers usually found in city charters; but no fair intendment can be drawn from this of a power to issue bonds and borrow money upon them for special purposes. The reasonable construction therefore is, that money to pay debts and expenses, and to provide special funds, is to be raised by the means for raising money expressly given by the charter, namely: by taxation or special assessment, and not by the issue of bonds, which is only authorized for one specific purpose. As these means are prescribed, any other means not expressly given seem to be excluded. The power to borrow money and issue bonds, not being expressly given by the charter, and not being clearly implied from any of its provisions, the question is presented whether the

city of Galveston or any other municipal corporation has this power without legislative authority expressly given or clearly implied.

It appears from the ordinance approved August 19, 1874, authorizing the issue of the bonds in question, and which is an exhibit to the petition, that the bonds were to be coupon bonds, payable to bearer at a future day. Both the bonds and coupons, therefore, would have all the qualities of commercial paper. Mercer Co. v. Hackett, 1 Wall. [68 U. S.] 83; Meyer v. Muscatine, Id. 384; Gelpcke v. Dubuque, Id. 175; Moran v. Miami Co., 2 Black [67 U. S.] 722. The charter expressly declares in title 5, which is exclusively devoted to taxation, that the city council shall have power within the city, by ordinance, to annually levy and collect taxes, not exceeding one per cent. on the assessed value of all real and personal estate and property in the city, and provides for various other methods of taxation; and title 6 prescribes the method to be pursued for the collection of taxes. There is authority given by the charter to issue bonds; but that is for one special purpose, and that purpose is not the construction of sidewalks. See title 9, art. 1, § 1, where the authority to issue bonds is restricted to a single object, and carefully limited and restrained.

The question is therefore fairly presented, whether the city of Galveston was invested with implied power to borrow money for the construction of sidewalks, and issue therefor its negotiable bonds and coupons, payable to bearer at a future day. Dillon, in his work on Municipal Corporations (section 407), says: "Banking and trading corporations have implied or incidental power to make negotiable paper, and the same rule has in some cases been applied to municipal corporations. The ordinary warrants of such corporations, it is clear, do not cut off equities, and it is at least doubtful how far they have the implied power to make paper which shall have this effect. The adjudged cases on this point are conflicting." The learned author (section 406) says: "In the author's judgment, the better opinion is, that there is no implied power in the officers of a town, county or city corporation to issue warrants or orders which shall be free from equities in the hands of holders; that the existence of such a power is not necessary as an incident to those ordinarily granted, or to carry out the purposes of the corporation, and would be attended with abuse, and fraught with danger."

These views are sustained by recent decisions of the supreme court of the United States. In the case of Police Jury v. Britton, 15 Wall. [82 U. S.] 570, the court says: "We have therefore the question directly presented in this case, whether the trustees or representative officers of a parish, county or other local jurisdiction, invested with the usual powers of administration in specific matters, and the power of levying taxes to

defray the necessary expenditures of the jurisdiction, have an implied authority to issue negotiable securities, payable in future, of such character as to be unimpeachable in the hands of bona fide holders, for the purpose of raising money or funding a previous indebtedness." In answering this question the court says: "The power to issue such obligations, and thus irretrievably to entail upon counties, parishes and townships a burden for which they have received no just compensation, opens the door to immense frauds on the part of petty officials and scheming speculators. It seems to us to be a power quite distinct from that of incurring indebtedness for improvements actually authorized and undertaken, the justness and validity of which was always to be inquired into. It is a power which ought not to be implied from the mere authority to make such improvements. It is one thing for county or parish trustees to incur obligations for work actually done in behalf of the county and parish and to give proper vouchers therefor, and a totally different thing to have the power of issuing unimpeachable paper obligations which may be multiplied to an indefinite extent. If it be once conceded that trustees or other local representatives of townships, counties and parishes have the implied power to issue coupon bonds payable at a future day, which may be valid and binding obligations in the hands of innocent purchasers, there will be no end to the frauds that will be perpetrated." And so the court held that the officers of a parish, county or other local jurisdiction invested with the usual powers of administration in specific matters, and the power of levying taxes to defray the necessary expenditures of the jurisdiction, have no implied authority to issue negotiable securities payable in future, of such a character as to be unimpeachable in the hands of bona fide holders, for the purpose of raising money or funding a previous debt.

The only difference between the case just cited and the one under consideration is, that the former was the case of a parish in Louisiana and the latter the case of a city in Texas. The questions raised and decided in the case of Police Jury v. Britton, supra, are identical in all respects with those presented in this. I shall follow this authority until overruled, because it is the judgment of the court of last resort, and also because I heartily approve it. In a more recent case (Mayor v. Ray, 19 Wall. [86 U. S.] 468), the same court held that neither the power to borrow money nor to issue commercial paper therefor belongs to a municipal corporation as an incident of its creation. To be possessed, it must be conferred by legislation, either express or implied. The case is decided, it is true, by a divided court, but there is no dissent from the proposition decided in the case of Police Jury v. Britton, supra. The point of difference between the judges seems to have been whether certificates of debt, city warrants, orders, checks, drafts, and the like, used for giving to public creditors evidence of the amount of their claims are or are not commercial paper, so that the holder takes them free from legal and equitable defenses, and with an absolute obligation on the part of the municipal corporation to pay them. But as I read the case, there does not appear to be any dissent from the general proposition, unless it be by Mr. Justice Hunt, that a municipal corporation, with power of taxation, given it for the purpose of raising means to carry on its functions, cannot raise money by issuing or selling its coupon bonds, due at a future day and payable to bearer, without legislative authority, expressly given or clearly implied. These two decisions by the supreme court of the United States are a law to this court which it follows with willing steps. A construction of the charters of municipal corporations which, without the express permission of the legislative power, gives their officers the power to issue bonds, having all the qualities of commercial paper, without limit as to amount or time of payment, affords an opportunity for the most stupendous frauds, and presents a temptation to their perpetration to a class of officials who, as the history of the country shows, are frequently rapacious and unscrupulous. One of the great evils of these times is the increase in the amount of the indebtedness of counties, towns and cities. The facilities which have been supposed to exist for the borrowing of money and the issuing of bonds by these local jurisdictions have fostered extravagance, fraud and peculation, and loaded the people with burdens grievous to be borne. The result has been the prosperity of cities has been destroyed, and the property of the inhabitants subjected to a public mortgage, in many cases equal in amount to the value of the property itself.

The assumption of authority by municipal corporations to issue bonds by virtue of their general corporate power is a recent one. It has always been denied by many courts of the highest respectability. In my judgment, it should never have been admitted. So dangerous a power should be expressly and deliberately conferred, so that the taxpayer may be protected by prudent guards and limitations. Whenever the power to issue bonds may become necessary for the prosecution of some work or improvement involving large cost, or for any other purpose, the power can be conferred by the legislature, with proper restrictions. But, in my judgment, no such authority ought to be implied from the general grant of corporate powers. But it seems to me that the provisions of the charter of the city of Galveston clearly exclude the power to issue bonds to pay for sidewalk improvements. The same section of the charter (section 8, art. 3, tit. 4), which confers upon the city council the power to construct sidewalks, points out with minuteness and precision the manner in

which the cost of their construction is to be defrayed. There is no escape from the language: "The cost of construction of sidewalks shall be defrayed by the owners of the lot or part of lot or block fronting on the sidewalk," and "the cost of any sidewalk constructed by the city shall be collected, if necessary, by the sale of the lot on which it fronts." Here is a designation of the property which is to pay, and of the manner in which payment is to be enforced. These provisions exclude any other method of payment. They clearly exclude the idea that the city may pay for such pavements by issuing its coupon bonds, bearing ten per cent. interest, and payable to bearer in fifteen years. Mayor v. Ray, 19 Wall. [86 U. S.] 468. It is no answer to this to say that the city may, nevertheless, enforce payment from the owners of the lots. Suppose the lots do not pay the cost of the sidewalks? The city, by its issue of bonds, has made itself liable, and will have the deficiencies to meet. The city could not be made liable for these deficiencies if it had not assumed the liability by the issue of its bonds. Lake v. Village of Williamsburg, 4 Denio, 520; McCullough v. Mayor, etc., of Brooklyn, 23 Wend. 458; Baldwin v. City of Oswego, 1 Abb. Dec. 62; City of New Albany v. Sweeney, 13 Ind. 245. The city undertakes to pay in the first instance for these sidewalks, and to take the risk of reimbursing itself from the property owners. This is a clear departure from the authority conferred by the charter. "A corporation can act only in the manner prescribed by the act of incorporation which created it." Head v. Insurance Co., 2 Cranch [6 U. S.] 127. The city cannot assume a primary liability for these improvements. Reock v. Mayor, etc., of Newark, 33 N. J. Law, 131; City of New Albany v. Sweeney, 13 Ind. 245; McCullough v. Mayor, etc., of Brooklyn, 23 Wend. 458. The ordinance of August 19, 1873, which provides for the construction of the sidewalks, also declares that the cost of their construction shall be a charge against the property fronting thereon, and shall be assessed against the same. It then prescribes how the assessments shall be paid or its collection enforced. This, it seems to me, exhausts the power of the city council on this subject. It surely could not have been within the contemplation of the legislature that the city council, after taking these steps specially authorized by the charter, and amply sufficient for the payment of the cost of sidewalks, should then provide that the city itself should assume the primary liability, and advance the cost for the lot owners by an issue of its coupon bonds, payable to bearer in fifteen years.

My conclusions on this branch of the case may therefore be summed up as follows:

1. The power to borrow money and issue bonds for sidewalk improvements must be conferred upon the city council of Galveston before that body can assume to perform these acts.

2. This power is not inherent in a municipal corporation.

3. It is not expressly conferred by, nor can it clearly be implied from, any provision in the charter of Galveston.

4. The power is excluded by provisions found in the charter: (a) By the provisions for raising money by taxation for general and special purposes. (b) By the provision for issuing bonds, which is limited to a specific purpose, and that purpose not being sidewalk improvements. (c) By the provision that the cost of sidewalk improvements shall be borne by the owners of the abutting lots, and shall be collected by assessments on the abutting property.

In my judgment, the assumption by the city council of authority to issue these bonds for sidewalk improvements was not only unauthorized by the charter, but was a clear and flagrant violation of its meaning and spirit.

The result of the views above expressed is:

1. That the plaintiffs have not by their pleadings shown a good cause of action against defendant, for want of an averment that they had performed the conditions precedent, which were necessary to be performed in order to make the contract, even if authorized, binding upon the city; and,

2. That neither the city council of Galveston, nor any committee of its appointment had authority to make the contract sued on. It is therefore, absolutely null and void.

The demurrer to the petition of plaintiffs as amended is therefore sustained.

[NOTE. This case was then taken by the plaintiffs to the supreme court on writ of error, where the judgment was reversed in an opinion by Mr. Justice Strong, who said that the proviso with reference to the consent of the property owners referred to the materials to be used, and not to the execution of the work itself. Mr. Justice Bradley, Mr. Justice Miller, and Mr. Justice Field dissented, because they considered that the consent of the owners was a condition precedent to commencing the work. 96 U. S. 341. The defendant then filed additional demurrers, which were stricken off by the circuit court. Case No. 6,533. The plaintiffs, having obtained judgment against the city, garnished stocks owned by the city, but a decree of sequestration was refused. 50 Fed. 263. Pending an appeal of this case, the plaintiffs applied for a writ of mandamus against the city, which was refused on account of appeal, and because stocks garnished were more than sufficient to pay judgment if garnishment was finally upheld. 48 Fed. 640.]